GEORGE MACLIN,                    )
                                 )
           Petitioner,           )        No. 15 C 04357
                                 )
    v.                           )
                                 )        Judge Edmond E. Chang
RANDY PFISTER,                   )
                                 )
           Respondent.           )

## MEMORANDUM OPINION AND ORDER

George Maclin filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2007 state court conviction for first-degree felony murder.[1] R. 1, Habeas Pet.[2] For the reasons stated below, Maclin's petition is denied and this Court will not issue a certificate of appealability.

# I. Background

In reviewing a petition for habeas corpus relief under § 2254, a federal court must presume that the factual findings made by the last state court to decide the case on the merits are correct. 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2015). This presumption can be overcome if the petitioner rebuts the state court's findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Because Maclin has not presented clear and convincing evidence to rebut this presumption of correctness, the Court adopts the facts set forth by the Illinois Appellate Court in *People v. Maclin*, 12 N.E.3d 648 (Ill. App. Ct. 2014)—the last

---

[1]The Court has subject matter jurisdiction over this case under 28 U.S.C. § 2241.

[2]Citations to the record are noted as "R." followed by the docket number and, when necessary, the page or paragraph number.

state court to address Maclin's arguments on the merits. Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, the facts are also supplemented where appropriate by the state-court record lodged with this Court. *See Todd v. Schomig*, 283 F.3d 842, 846 (7th Cir. 2002); *United States ex rel. Parish v. Hodge*, 73 F. Supp. 3d 895, 899 n.1 (N.D. Ill. 2014).

## A. Arrest and Trial

On July 3, 2002, Ernest McGhee was stabbed in the neck and died. *People v. Maclin*, 12 N.E.3d 648, 650 (Ill. App. Ct. 2014). That same day, the police arrested George Maclin for McGhee's murder. *Id.* On July 30, 2002, Maclin was indicted on charges of murder and armed robbery. *Id.* The State of Illinois proceeded to trial on one count of felony murder predicated on armed robbery. *Id.*; 720 ILCS 5/9-1(a)(3) (felony murder statute); 720 ILCS 5/18-2(a)(1) (armed robbery statute). Almost five year later, on May 16, 2007, Maclin's trial began in the Circuit Court of Cook County, Illinois. *Id.*

### 1. Testimony of Emmett Brown

At the time of Maclin's trial, Emmett Brown worked as a mechanic. *Maclin*, 12 N.E.3d at 650. Brown testified that he had been friends with McGhee for six or seven years. *Id.* He stated that at around 1 a.m. on July 3, 2002, he drove to a vacant lot on Adams Street and Western Avenue in Chicago to drink beer; he and his friends often visited that lot on weekends and during the week after work. *Id.* While sitting in the passenger seat of his car, Brown opened a beer and began talking to his friend Vearb Smith. *Id.* Brown stated that he then noticed Maclin

walking back and forth in the vacant lot and heard Maclin say "he wasn't going to let nobody else take no money from him" and "whoever do it he going to kill him." *Id.*

A little later, Brown saw another car pull up and park behind him. *Maclin*, 12 N.E.2d at 650. A woman named Helen was driving and McGhee was in the passenger seat. *Id.* at 650-51. When McGhee got out of the car, Maclin immediately approached McGhee and began arguing about $5 that McGhee owed Maclin. *Id.* at 651. Brown testified that Maclin told McGhee, "you going to pay me my money," and McGhee said, "I don't have it." *Id.* Maclin then told McGhee to go inside a nearby house and get the money. *Id.* McGhee went inside the house, but came out empty-handed. *Id.* Maclin then began to chase McGhee around one of the vehicles in the lot before pulling out a knife. *Id.* Brown stated that Maclin made a stabbing motion with the knife and said "you going to get my money or I'm going to kill you." *Id.* McGhee then ran across the street, picked up some "rocks or bricks," and began throwing them at Maclin. *Id.* Maclin then walked over to a blue van—which McGhee had been servicing earlier that day—parked on Adams Street. *Id.* at 650-51. Maclin took McGhee's toolbox from the van. *Id.* at 651. McGhee told Maclin, "you can't take my toolbox, I need that"; but Maclin responded, "you going to give me my money." *Id.* Maclin then put down the toolbox and began to chase McGhee again. *Id.* McGhee started to run away, but ran out of breath and slowed to a walk. *Id.* McGhee fell backward, hitting his head on the ground, which gave Maclin time to catch up, to get on top of McGhee, and to pin down McGhee's arms. *Id.* Brown

testified that Maclin grabbed McGhee's hands and "slowly stuck [McGhee] in the neck." *Id.* Maclin then got up and walked away. *Id.*

Brown testified that after Maclin stabbed McGhee in the neck, Brown got out of his car to help McGhee. *Maclin*, 12 N.E.3d at 651. A woman named Rebecca Beck also came over to help. *Id.* Both Brown and Beck helped McGhee walk over to the blue van. *Id.* Once they reached the blue van, McGhee collapsed against a light pole and began gasping for air. *Id.* Brown called the paramedics. *Id.* Brown stated that he went to the police station to give a statement and then returned to his car in the vacant lot. *Id.* Brown and Smith began trying to figure out Maclin's last name because they knew him simply as "George." *Id.* Brown and Smith remembered that Maclin had some "medical papers" with him when he was around the area of the vacant lot. *Id.* When they found Maclin's mail on the side of a building near the vacant lot, Brown called the police. *Id.* Both Brown and Smith brought Maclin's mail to the police station. *Id.* Brown testified that later that night, on July 3, 2002, he saw Maclin in the area of the vacant lot and called the police. *Id.* When the police arrived, Brown pointed them in the direction of Western Avenue and Jackson Boulevard. *Id.* On July 4, 2002, Brown identified Maclin in a lineup. *Id.*

### 2. Testimony of Vearb Smith

Vearb Smith testified that he and McGhee were friends and had worked as mechanics together. *Maclin*, 12 N.E.3d at 651. Smith stated that in the early morning of July 3, 2002, he was asleep on the second floor of a building located at 2337 West Adams Street. *Id.* Smith heard a commotion and went downstairs to see

what was going on.[3] *Id.* As he stood on the porch of his building, he saw McGhee lying on the ground with Maclin "standing on top of [McGhee]." *Id.* Maclin then walked away from McGhee, and McGhee started to yell for help. *Id.* Beck helped McGhee get up and walk toward Smith. *Id.* Smith noticed that McGhee was holding his neck, and saw McGhee collapse at the base of a light pole near the blue van. *Id.* Smith stated that he remained at the scene and spoke with a police officer. *Id.* Smith testified that later that morning, he was on the porch of his building talking to Brown. *Id.* Smith and Brown wanted to learn Maclin's last name. *Id.* Smith remembered that Maclin had been drinking in the area of the vacant lot with his "V.A. papers," *id.* at 651-52, presumably a reference to Veterans Affairs documents. Smith stated that he went to the side of a building where Maclin had been drinking, retrieved Maclin's papers, and gave the papers to Brown. *Id.* at 652. Smith and Brown then called the police and took the papers to the police station. *Id.* On July 4, 2002, Smith identified Maclin in a lineup. *Id.*

### 3. Testimony of Chicago Police Officer Todd Stremplewski

Chicago Police Officer Todd Stremplewski testified that he and his partner were the original officers on the scene, where they learned that a man had been stabbed with a knife. *Maclin*, 12 N.E.3d at 652. The next day, on July 4, 2002, Officer Stremplewski and his partner responded to a radio call regarding property found at the vacant lot of 2339 West Adams Street. *Id.* When he arrived at the lot,

---

[3]Although this might appear somewhat inconsistent with Brown's testimony, it is not necessarily so. Brown stated that Smith had walked away from the scene before the argument between Maclin and McGhee escalated. R. 10-6 at 103-04. So it is possible that Smith spoke with Brown just as Brown testified, and then also went home to bed before the incident between McGhee and Maclin occurred, as Smith's testimony suggests.

Officer Stremplewski spoke with Marilyn Green. *Id.* He testified that Green took him to the area where McGhee was killed and directed him to a nearby garbage can. *Id.* Officer Stremplewski looked in the garbage can and found a knife. *Id.* The parties stipulated that the knife had a bloodstain on it which was consistent with McGhee's DNA profile. *Id.*

### 4. Testimony of Chicago Police Detective David March

Chicago Police Detective David March was assigned as a follow-up detective to investigate McGhee's killing. *Maclin*, 12 N.E.3d at 652. Detective March testified that the original case report stated that the offender was named "George." *Id.* Detective March reviewed the available reports and learned that some mail addressed to Maclin had been recovered. *Id.* At 11:30 p.m. on July 3, 2002, Detective March received a telephone call from Brown; Brown informed March that Maclin was back at the scene of McGhee's killing. *Id.* When Detective March arrived at the scene, Beck directed him to a Chicago Transit Authority bus that was going westbound on Jackson Boulevard. *Id.* Detective March and his fellow detectives stopped the bus and took Maclin into custody. *Id.* At the police station, Detective March advised Maclin of his *Miranda* rights and interviewed him. *Id.* Maclin denied having any knowledge of, or involvement in, McGhee's death. *Id.* Maclin stated that he did not remember where he was during the incident. *Id.* Detective March testified that as part of processing, he removed Maclin's shirt to note any scars, tattoos, or other marks that could be used for identification purposes. *Id.* When he did this, Detective March noticed an abrasion on Maclin's left armpit area. *Id.* When Detective March asked Maclin about this, Maclin replied that the injury occurred

two weeks earlier but that he did not remember how it happened. *Id.* Detective March did not notice any blood on Maclin's shirt. *Id.*

### 5. Testimony of Medical Examiner Mitra Kalelkar

Dr. Mitra Kalelkar testified that she is a forensic pathologist and the one who conducted McGhee's autopsy. *Maclin*, 12 N.E.3d at 652. Dr. Kalelkar stated that the cause of McGhee's death was internal bleeding as a result of a stab wound to the left side of his neck. *Id.* She concluded that McGhee's death was a homicide. *Id.*

### 6. Maclin's Testimony

Maclin testified in his own defense. He testified that on July 3, 2002, he was sitting in a white van in the area of Adams Street and Western Avenue, smoking crack cocaine with a friend named "Willie." *Maclin*, 12 N.E.3d at 652. Maclin stated that he saw McGhee in the area and approached him. *Id.* Maclin asked McGhee if he had the money that he owed Maclin. *Id.* Maclin stated that McGhee looked at him in an angry way and that he felt scared. *Id.* Maclin again asked McGhee about the money, and McGhee became "indignant." *Id.* McGhee stated that he did not owe Maclin any money, nor would he give Maclin any money. *Id.* Maclin testified that he backed away from McGhee because McGhee had several people with him. *Id.* at 652-53. McGhee then came toward Maclin "in a manner like he was getting ready to reach out." *Id.* Maclin testified that he was scared and reacted by hitting McGhee. *Id.* Maclin then went back to the white van, got into the driver's seat, and smoked another bag of crack cocaine with Willie. *Id.*

A little later, McGhee was standing next to the driver's side of the white van. *Maclin*, 12 N.E.3d at 653. McGhee asked Maclin to get out. *Id.* As Maclin opened

the van door, he felt a sharp sting in the area of his armpit, as if he was "being stuck with something." *Id.* Maclin looked down and noticed McGhee pulling his hand back. *Id.* Maclin saw something in McGhee's hand but could not tell what it was. *Id.* Maclin testified that he fell back into the van and picked up his knife from the seat. *Id.* Maclin then noticed a toolbox on the floor of the driver's side of the van. *Id.* Maclin stated that he grabbed the toolbox to use as a shield. *Id.*

Maclin testified that he stepped outside the white van with the toolbox in his right hand and the knife in his left. *Maclin*, 12 N.E.3d at 653. He backed up toward Western Avenue to get away from McGhee because McGhee had several friends with him. *Id.* As Maclin walked away, he noticed McGhee following him, so Maclin stopped and turned toward McGhee. *Id.* McGhee also stopped and was about 15 or 20 feet away from Maclin. *Id.* Maclin began walking again, but soon noticed McGhee jogging toward him. *Id.* Maclin turned toward McGhee and said "man leave me alone." *Id.* Maclin began walking again and turned around to see where McGhee's friends were; they were standing back, but McGhee was standing right in front of Maclin. *Id.* Maclin testified that McGhee stepped back and the two men got tangled and fell. *Id.* Maclin fell on top of McGhee and noticed that McGhee was holding an object resembling a screwdriver. *Id.* Maclin grabbed McGhee's hands and put his knees on McGhee's arms. *Id.* Maclin testified that "next think [sic] I know, [Beck] is standing there." *Id.* Beck told the two men to "stop all of this" and to "give me those things." *Id.* Maclin testified that he handed the knife to Beck and began to get off McGhee, but noticed that McGhee still had an object in his hand. *Id.* Maclin

grabbed McGhee's hand and Beck took the object from McGhee. *Id.* Maclin then got off of McGhee and walked away; McGhee walked in the other direction. *Id.* Maclin testified that Beck yelled "somebody is bleeding." *Id.* At that time, Maclin did not know McGhee had been stabbed. *Id.*

Maclin also testified that he sat in a park until morning because he lived at Woodside Manor and the doors were locked for the night. *Maclin*, 12 N.E.3d at 653. Woodside Manor is a health care and assisted living facility in Chicago Heights, Illinois. *Id.* At 6:30 a.m. on July 3, 2002, Maclin took the bus to St. James Hospital to have his wound treated. *Id.* Maclin testified that his wound was flushed and bandaged, and that he was given medication. *Id.* Maclin was then released from the hospital. *Id.* After he arrived back home at Woodside Manor, Maclin went to see "Nurse Mary." *Id.* Maclin stated that Nurse Mary works at Woodside Manor and fills prescriptions for patients. *Id.* Nurse Mary looked at Maclin's wound and gave him medication. *Id.* Later in the day on July 3, 2002, Maclin went back to the area of the vacant lot to try to buy drugs. *Id.* Maclin stated that while he was on a bus on Jackson Boulevard, a police officer removed him from the bus.[4] *Id.*

### 7. Testimony of Nurse Mary Willis

Mary Willis testified that in July 2002 she worked as a licensed practical nurse at Woodside Manor in Chicago Heights. *Maclin*, 12 N.E.3d at 654. She stated that on July 3, 2002, she was approached by Maclin who said he had been stabbed. *Id.* Nurse Willis observed a puncture wound on Maclin's left chest, which looked

---

[4]After Maclin's testimony concluded, defense counsel filed a motion seeking to admit evidence of McGhee's propensity for violence pursuant to *People v. Lynch*, 470 N.E.2d 1018 (1984). *Maclin*, 12 N.E.3d at 654. The trial court denied the motion. *Id.*

"fresh" but was not bleeding. *Id.* Nurse Willis faxed Maclin's prescriptions to a pharmacy outside of Woodside Manor. *Id.* She stated that she asked Maclin how he was injured, and Maclin replied "I woke up in the woods, and I don't know what woods." *Id.* Maclin made no mention of being stabbed by McGhee. *Id.*

### 8. Trial Verdict

After closing arguments, the trial court instructed the jury on the offenses of first-degree murder and armed robbery. *Maclin*, 12 N.E.3d at 654. The jury was told to return a verdict of guilty only if it found that the State had proven all of the elements of both offenses beyond a reasonable doubt. *Id.* The trial court refused to instruct the jury on the defenses of necessity and self-defense. *Id.* The jury found Maclin guilty of first-degree felony murder. *Id.* On June 19, 2007, Maclin filed a motion for a new trial, which the trial court denied. *Id.* On October 29, 2007, the trial court sentenced Maclin to a mandatory term of life imprisonment because he had previously been convicted of first-degree murder. *Id.*

### B. Direct Appeal

On direct appeal, Maclin—who was represented by counsel at the time— argued that (1) the State failed to prove that he was guilty of felony murder beyond a reasonable doubt, and (2) the trial court erred in refusing to admit evidence of McGhee's violent history pursuant to *People v. Lynch*, 470 N.E.2d 1018 (Ill. 1984). *Maclin*, 12 N.E.3d at 654; R. 10-10, Exh. C, Pet'r's Direct Appeal Br. The Illinois Appellate Court rejected Maclin's arguments and affirmed the judgment of the trial court. *Maclin*, 12 N.E.3d at 654. The appellate court concluded that based on the

evidence at trial, the jury could have reasonably inferred that Maclin took the toolbox through a threat of force, and that he did so before stabbing McGhee. *Id.* The appellate court further concluded that the trial court did not err in excluding evidence of McGhee's violent history because that evidence was both legally and factually irrelevant. *Id.* Maclin then filed a Petition for Leave to Appeal with the Illinois Supreme Court. R. 10-11, Exh. F, Pet'r's Direct Appeal PLA. In his petition, Maclin argued that the Illinois Appellate Court erred in affirming the trial court's decision to exclude the evidence of McGhee's violent history. *Id.* at 2-3.[5] On March 24, 2010, the Illinois Supreme Court denied Maclin's petition. R. 10-11, Exh. G, Denial of Direct Appeal PLA.

### C. Post-Conviction Proceedings in State Court

On September 21, 2010, Maclin filed a *pro se* post-conviction petition in state court. *Maclin*, 12 N.E.3d at 654; *see also* R. 10-11, Exh. H, Pet'r's Post-Conviction Pet. Maclin argued, among other things, that direct-appeal counsel was ineffective for failing to argue that the trial court erred in refusing to instruct the jury on the defenses of necessity to the armed robbery of the toolbox and self-defense to felony murder. *Maclin*, 12 N.E.3d at 654; Pet'r's Post-Conviction Pet. On December 17, 2010, the trial court dismissed Maclin's petition as frivolous and patently without merit. *Maclin*, 12 N.E.3d at 654.

On post-conviction appeal, Maclin renewed his claim that his direct-appeal counsel was ineffective for failing to argue that the trial court erred in refusing to

---

[5]When citing Maclin's state court briefs, the Court cites to the page number of the actual briefs.

instruct the jury on the defenses of necessity and self-defense. R. 10-11, Exh. I, Pet'r's Post-Conviction Appeal Br. at 1. Maclin asserted that he was entitled to the instructions "given the unusual fact pattern in which there was some evidence that [McGhee] … stabbed Maclin before Maclin committed the armed robbery." *Id.* Maclin was represented by counsel during his post-conviction appeal. *Id.* at 28. The Illinois Appellate Court rejected Maclin's arguments. R. 10-12, Exh. L, Appellate Court Post-Conviction Op.; *see also People v. Maclin*, 12 N.E.3d 648 (Ill. App. Ct. 2014). Maclin filed a Petition for Leave to Appeal with the Illinois Supreme Court, in which he asserted—again through counsel—that his direct-appeal counsel was ineffective for failing to argue that the trial court erred in refusing to instruct the jury on the defenses of necessity and self-defense. R. 10-12, Exh. M, Pet'r's Post-Conviction PLA at 2-4. On September 24, 2014, the Illinois Supreme Court denied Maclin's petition. R. 10-12, Exh. N, Denial of Post-Conviction PLA.

### D. Federal Habeas Corpus Petition

Maclin filed his *pro se* petition for a writ of habeas corpus in this Court on May 18, 2015. R. 1, Habeas Pet. Maclin raises two claims in his petition. First, he asserts the Illinois trial court violated his federal due process rights by failing to conduct an initial review of his state post-conviction petition within 90 days of its filing, as required by the Illinois Post Conviction Hearing Act, 725 ILCS 5/122-2.1(a). *Id.* at 5. Second, he asserts his direct appeal counsel was ineffective for not arguing that the trial court erred in refusing to instruct the jury on the defenses of necessity and self-defense. *Id.*

In July 2015, this Court dismissed Maclin's first claim when it conducted its initial review of Maclin's habeas petition. R. 4, 7/06/15 Order at 2-3; *see also* Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts (requiring district courts to conduct a preliminary review of all habeas petitions). The Court explained that even if the state court had failed to abide by Illinois' 90-day requirement, as Maclin alleges, the state court's failure still would not amount to an independent *federal* due process claim, especially because the 90-day rule had no bearing on Maclin's guilt or innocence. 7/06/15 Order at 2-3. So the Court dismissed that claim. But Maclin's second claim—his ineffective assistance of direct appeal counsel claim—was allowed to move forward. *Id.* at 3.

On August 17, 2015, the State answered Maclin's petition and submitted the applicable state court records. R. 9, State's Answer to Habeas Pet.; *see also* R. 10. The State asks this Court to deny Maclin's petition. State's Answer to Habeas Pet.

## II. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, a state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, 28 U.S.C. § 2254(b)(1)(A), "thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights," *Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (internal quotation marks and citation omitted). A habeas petitioner must fully and fairly present his federal claims through one complete round of the state appellate review process before filing a federal habeas

petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If a petitioner fails to properly assert his federal claims at each level of state review, his claims are procedurally defaulted. *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013).

But if the petitioner successfully runs the procedural-default gauntlet for a particular claim, then a federal court can at least consider the merits of that federal habeas claim. Under AEDPA, however, a federal court may not grant habeas relief unless the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Alternatively, under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 413. But even if a federal court independently concludes that the relevant state-court decision applied clearly established federal law erroneously, still the writ does not necessarily issue; rather, the state court's application must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "This is a difficult standard to meet; 'unreasonable' means 'something like lying well outside the

boundaries of permissible differences of opinion.'" *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)).

### III. Analysis

In his only remaining habeas claim, Maclin asserts that his attorney on direct appeal was ineffective for not asserting that the trial court erred in refusing to instruct the jury on two defenses: (1) a defense of necessity for the armed robbery of the toolbox, and (2) self-defense to felony murder. Habeas Pet. at 5. In assessing Maclin's claim, the Court must construe Maclin's *pro se* petition liberally. *Perruquet v. Briley*, 390 F.3d 505, 512 (7th Cir. 2004). The relevant decision for habeas review is the decision of the last state court to rule on the merits of Maclin's claim. *Morgan v. Hardy,* 662 F.3d 790, 797 (7th Cir. 2011). Here, that is the Illinois Appellate Court's decision affirming the denial of Maclin's post-conviction petition. *People v. Maclin*, 12 N.E.3d 648 (Ill. App. Ct. 2014); *see also* R. 10-12, Exh. L, Appellate Court Post-Conviction Op.

Initially, the Court notes that the State does not dispute that Maclin has exhausted his state-court remedies, *see* State's Answer to Habeas Pet, and this is for good reason. Illinois has a two-tiered appellate review system. *McDowell*, 737 F.3d at 482. To avoid procedural default, "a petitioner must present a claim at each level of the state court system, either on direct appeal or in post-conviction proceedings." *Id.* Here, Maclin presented his same ineffective assistance of direct-appeal counsel claim during every stage of his state court post-conviction process (of course he could not raise such a claim during the direct appeal itself). Maclin raised the claim

in his original post-conviction petition before the state trial court. R. 10-11, Exh. H, Pet'r's Post-Conviction Pet. He raised it again on post-conviction appeal. R. 10-11, Exh. I, Pet'r's Post-Conviction Appeal Br. And he raised it a third time in his post-conviction petition to the Illinois Supreme Court. R. 10-12, Exh. M, Pet'r's Post-Conviction PLA. Maclin's claim is therefore not subject to procedural default. *See Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (explaining that in Illinois, exhaustion of a claim requires the petitioner to directly appeal to the Illinois Appellate Court and present the claim in a petition for leave to appeal to the Illinois Supreme Court). The Court may properly consider the merits of Maclin's claim.

## A. Necessity Defense

Maclin first contends that his direct-appeal counsel was ineffective for not arguing that the trial court erred in refusing to instruct the jury on the defense of necessity to the armed robbery of the toolbox. Habeas Pet. at 5. Maclin contends that there was "some evidence" that McGhee stabbed him first and that he took the toolbox to use as a shield against McGhee. *Id.* Although Maclin does not lay out any more detail in his *pro se* petition, presumably, what Maclin is trying to argue (as he did in his state court post-conviction proceedings, when he was represented by counsel on post-conviction appeal) is that based on this evidence, the jury could have found that he committed the armed robbery out of necessity, and therefore, that he was not guilty. As a result, Maclin would argue, appellate counsel should have challenged—and was ineffective for not doing so—the trial court's refusal to give this instruction, as there is a reasonable probability that the appellate court

would have reversed Maclin's conviction based on this necessity defense. *Maclin*, 12 N.E.3d at 657. *See also* Pet'r's Post-Conviction Appeal Br. at 19-21; Pet'r's Post-Conviction PLA at 17-19.

Ineffective assistance of counsel claims like Maclin's are governed by the familiar two-part, performance-and-prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Maclin must show (1) that his attorney's performance was deficient and (2) that he was prejudiced by that deficient performance. 466 U.S. at 687. To satisfy the first element, Maclin must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. But in assessing his attorney's performance, the Court must maintain a "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 689. So Maclin bears a "heavy burden" in establishing ineffective assistance. *Walker v. Litscher*, 421 F.3d 549, 558 (7th Cir. 2005). To satisfy the second element, Maclin must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Both elements must be satisfied before relief may be granted. *Id.* at 697; *Walker*, 421 F.3d at 558.

Maclin challenges the assistance he received from his direct-appeal counsel; the two-element *Strickland* standard also governs ineffective assistance of appellate counsel claims. *Smith v. Robbins*, 528 U.S. 259, 285-89 (2000); *Howard v. Gramley*, 225 F.3d 784, 789-90 (7th Cir. 2000). When challenging whether appellate counsel failed to raise the correct issues on appeal—as Maclin does here—the performance

element may be met by showing that "[appellate] counsel omit[ted] a 'significant and obvious issue' without a legitimate strategic reason for doing so." *Howard*, 225 F.3d at 790 (quoting *Mason v. Hanks*, 97 F.3d 887, 892-93 (7th Cir. 1996)). The prejudice element is met "when that omitted issue 'may have resulted in a reversal of the conviction, or an order for a new trial.'" *Id.* (quoting *Mason*, 97 F.3d at 893). But counsel is not required to raise every non-frivolous claim, and will not be deemed ineffective merely for failing to do so. *Smith*, 528 U.S. at 288; *Mason*, 97 F.3d at 893 ("Effective advocacy does not require the appellate attorney to raise every non-frivolous issue[.]"). Instead, counsel may properly "select from among the[] [non-frivolous claims] in order to maximize the likelihood of success on appeal." *Smith*, 528 U.S. at 288; *Page v. United States*, 884 F.2d 300, 302 (7th Cir. 1989) ("One of the principal functions of appellate counsel is winnowing the potential claims so that the court may focus on those with the best prospects.").

In this case, the Illinois Appellate Court properly identified *Strickland* as the standard applicable to Maclin's ineffective assistance of counsel claim. *Maclin*, 12 N.E.3d at 658 ("A defendant's claim of ineffective assistance of counsel is analyzed under … *Strickland*… ."). It also correctly identified and discussed *Strickland*'s two requirements. *Id.* Because the Illinois Appellate Court identified the correct legal rule, its analysis was not contrary to clearly established federal law. *See Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006) ("A decision applying the correct legal rule to the facts of a case is not 'contrary to' within the meaning of § 2254(d)(1).").

This then leaves the question of whether the Illinois Appellate Court unreasonably applied *Strickland*. To make this showing, Maclin must demonstrate that although the appellate court identified the correct legal rule, it unreasonably applied the controlling law (in this case, *Strickland*) to the facts of the case. *Williams*, 529 U.S. at 413. This is a difficult showing for Maclin to make because under AEDPA, the Court must defer to the state court's application of *Strickland* unless it was "objectively unreasonable." *Williams*, 529 U.S. at 409; *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("pivotal question [under habeas statute] is whether the state court's application of the *Strickland* standard was unreasonable"). Put another way, the Court is not deciding whether the state court's determination was correct under *Strickland*, but rather whether it "produced an answer within the range of defensible positions." *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006) (internal quotation marks omitted); *Harrington*, 562 U.S. at 101. This is a "substantially higher threshold," *Knowles*, 556 U.S. at 123, as the Court must give the Illinois Appellate Court "a deference and latitude that [would] not [be] in operation [if] the case involve[d] review under the *Strickland* standard itself," *Harrington*, 562 U.S. at 101. What's more, because *Strickland* is a "general standard," state courts are given "even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more

general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations")). So Maclin faces a "doubly deferential judicial review." *Id.*

In its evaluation of this claim, the Illinois Appellate Court held that Maclin's attorney on direct appeal was not ineffective because the trial court properly denied the necessity instruction. *Maclin*, 12 N.E.3d at 657-59. The Illinois Appellate Court explained that, in Illinois, a defendant is entitled to the necessity defense only if he is "without blame in [causing] or developing the situation at issue." *Id.* at 658 (citing *People v. Brown*, 793 N.E.2d 75, 81 (Ill. App. Ct. 2003); *People v. Roberts*, 483 N.E.2d 1328, 1329 (Ill. App. Ct. 1985); *People v. Perez*, 422 N.E.2d 945, 948 (Ill. App. Ct. 1981)); *see also* 720 ILCS 5/7-13. Even assuming Maclin's testimony was credible, the Illinois Appellate Court concluded that Maclin still "shared blame for creating the situation in which he took McGhee's toolbox." *Id.* The appellate court supported its holding with the following evidence: Maclin's testimony that he approached McGhee to ask about money McGhee owed him; Maclin's testimony that *he* hit McGhee after McGhee appeared to be reaching toward Maclin; Maclin's testimony that this was the first physical contact between the two men; and Brown's testimony that before McGhee arrived at the vacant lot, Maclin was walking around saying he would kill anyone who tried to take money from him. *Id.* at 658-59. This evidence, the Illinois Appellate Court stated, "clearly establishes that Maclin played a role in causing or exacerbating the situation in which [Maclin] ended up taking McGhee's toolbox." *Id.* at 659. The Illinois Appellate Court then held that the trial court did not err in refusing to give the necessity instruction and

Maclin's attorney was not deficient for failing to raise the necessity defense issue on appeal. *Id.*

The Illinois Appellate Court's decision was a reasonable one. As an initial matter, the Court must accept the Illinois Appellate Court's determination that Maclin was not entitled to the necessity defense under Illinois law. Whether a defendant is entitled to a particular jury instruction in state court is a matter of state law. *See Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004) ("a state trial court's evidentiary rulings and jury instructions turn on state law"); *Little v. Brannon*, 2015 WL 4429117, at *3 (N.D. Ill. July 20, 2015). Because state courts are the "ultimate expositors of their own states' laws," *McCloud v. Deppisch*, 409 F.3d 869, 875 (7th Cir. 2005) (internal quotation marks omitted), it is "not the province of a federal habeas court to reexamine state-court determinations on state law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Perruquet*, 390 F.3d at 511; *Bates v. McCaughtry*, 934 F.2d 99, 102 (7th Cir. 1991) ("State law means what state courts say it means ... A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254."); *United States ex rel. Waters v. Bensinger*, 507 F.2d 103, 105 (7th Cir. 1974); *Little*, 2015 WL 4429117, at *3. So the Court is bound by the Illinois Appellate Court's determination that, under Illinois law, Maclin was not entitled to the necessity instruction at trial.[6]

---

[6]Improper jury instructions may support the issuance of a writ of habeas corpus only where the instruction violates a *federal* right, such as the federal right to due process of law. *Perruquet*, 390 F.3d at 511 n.1. To be sure, it is possible to rely on ineffective assistance (a federal constitutional right) to advance a claim based on a state-law jury

But even putting this required deference aside, a review of the record shows that Maclin has little ground to stand on in arguing that he was wholly without blame for creating the violent encounter. Maclin's own testimony shows that *he* initiated the first physical contact between him and McGhee—not McGhee. Maclin testified on direct examination that when McGhee came toward him "in a manner like he was getting ready to reach out," Maclin "reacted and I hit him." R. 10-7 at 100-01, Exh. B, Trial Record. Even according to Maclin, this is the first physical contact that happened between the two men. The contact also occurred—again, this is based on Maclin's own testimony—before Maclin found the toolbox. *Id.* at 101-08 (testifying that after he hit McGhee, Maclin went back to the white van, smoked more crack cocaine, and did not notice the toolbox until McGhee later came up to the driver's side of the white van); *see also Maclin*, 12 N.E.3d at 653 (same). And Maclin could have responded differently; as the Illinois Appellate Court pointed out, Maclin could have simply walked away. *Id.* at 659. But he did not. Maclin's decision to initiate physical contact with McGhee contributed to the situation's escalation, or at least reasonably could be viewed as contributing to it. So too could Maclin's decision to approach McGhee about the money in the first place. The appellate court's finding that Maclin was not without blame for creating the situation in which he needed the toolbox was reasonable.

Because Maclin was not entitled to the instruction at trial, Maclin cannot show that appellate counsel's decision not to pursue the necessity instruction

_____

instruction error, but the Illinois courts still are the final arbiters of state law (unless the state-court decision itself is so arbitrary or so departs from precedent that federal due process is violated).

argument on appeal constituted deficient performance. This was not a "significant and obvious issue" that counsel had no legitimate reason for forgoing. *Howard*, 225 F.3d at 790; *United States ex rel. Navarro v. Atchison*, 69 F. Supp. 3d 810, 827 (N.D. Ill. 2014). To the contrary, appellate counsel had a legitimate reason for not raising it: it was likely to be a losing argument. "Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996). At the very least, the Illinois Appellate Court's decision that Maclin's attorney on direct appeal was not ineffective for failing to pursue this necessity defense argument was reasonable.

## B. Self-Defense

Maclin next contends that his attorney on direct appeal was ineffective for failing to argue that the trial court erred in refusing a self-defense instruction to felony murder. Habeas Pet. at 5. Maclin argues that "given the unusual fact pattern in which there was some evidence that [McGhee] stabbed [Maclin] before [Maclin] grabbed the toolbox" and later retaliated, Maclin was entitled to a self-defense instruction. *Id.* Maclin again does not elaborate on this argument. But presumably (relying on his post-conviction briefing, when he was represented by counsel), Maclin is asserting that the jury could have believed his version of the events in which he stabbed McGhee in self-defense after McGhee allegedly first stabbed him, and that the jury could have concluded that he was not guilty of felony murder. In turn, Maclin would argue that his attorney should have raised this argument on

direct appeal because the appellate court would have reversed Maclin's conviction based on this argument. *Maclin*, 12 N.E.3d at 659.

This claim is again an ineffective-assistance-of-counsel claim, so it too is governed by *Strickland*. When conducting its analysis here, the Illinois Appellate Court properly relied on *Strickland*. *Id.* at 659-60. So its decision was not contrary to clearly established law. *Garth*, 470 F.3d at 710. This leaves Maclin in the same position as before. In order to succeed on his self-defense claim, he must show that the Illinois Appellate Court's application of *Strickland* was unreasonable. *Williams*, 529 U.S. at 413. This requires him to overcome the "doubly deferential" standard of review discussed above—something he is unable to do.

In its decision, the Illinois Appellate Court held that Maclin's attorney was not ineffective for failing to pursue this self-defense argument. The Illinois Appellate Court first explained that the trial court properly denied the self-defense instruction because there was not enough evidence to support it. *Maclin*, 12 N.E.3d at 659-60. The appellate court noted that "[a] criminal defendant [in Illinois] is entitled to have a jury instruction on any legally recognized affirmative defense theory on which he was presented 'some evidence.'" *Id.* at 658 (quoting *People v. Roberts*, 483 N.E.2d 1328, 1329 (Ill. 1985). But the Illinois Appellate Court then went on to explain that a defendant in a felony murder case is generally not entitled to a self-defense jury instruction. *Id.* at 659-60 (citing *People v. Walker*, 911 N.E.2d 439, 450 (Ill. App. Ct. 2009)). There is only one narrow exception to this rule: "Provocation and belief in the need for self-defense can be partial defenses to felony

24

murder, if the provocation or the belief in the need for self-defense occurred *before* [the] defendant formed the intent to commit the underlying felony." *Id.* at 660 (internal quotation marks omitted) (emphasis added). The Illinois Appellate Court concluded that in Maclin's case, there was not enough evidence presented at trial to support the instruction. *Id.* The court stated that Maclin's guilt at trial was overwhelming; it pointed to the following evidence: Brown's testimony that before the altercation with McGhee, Maclin was walking around the vacant lot saying he was going to kill someone if they took money from him; evidence that Maclin initiated the altercation, took the toolbox after McGhee refused to give him money, and chased McGhee and stabbed him in the neck; Detective March's testimony that Maclin claimed he had no knowledge of the incident with McGhee (showing Maclin's consciousness of guilt); Detective March and Nurse Willis's testimonies that Maclin told them he did not know how he received the abrasion on his chest (again showing Maclin's attempt to entirely avoid being placed at the scene); and Detective March's testimony that Maclin told him his injury occurred weeks before the incident with McGhee. *Id.* Based on this evidence, the Illinois Appellate Court held that Maclin was not able to satisfy the "some evidence" standard; nor was he able to show that the trial court erred in refusing to give the instruction. *Id.* The Illinois Appellate Court then went on to note that "even if the trial court had erred in refusing to instruct the jury on self-defense, the error would have been harmless because the evidence of Maclin's guilt was overwhelming and the outcome of the trial would not have been affected." *Id.* The Illinois Appellate Court concluded that Maclin's

"appellate counsel's representation was not unreasonable, and Maclin was not prejudiced by counsel's representation." *Id.*

The Illinois Appellate Court's decision was again reasonable. As discussed above, a federal habeas court is not in the business of "reexamin[ing] state-court determinations on state law questions." *Estelle*, 502 U.S. at 67-68; *Waddington v. Sarausad,* 555 U.S. 179, 192 n.5 (2009); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993); *Huusko v. Jenkins*, 556 F.3d 633, 637 (7th Cir. 2000) ("a federal court cannot issue a writ of habeas corpus that rests on a belief that a state court has misunderstood or misapplied state law"). In this case, the Illinois Appellate Court observed that a self-defense instruction is only appropriate under Illinois law when the defendant presents "some evidence" to support it. *Maclin*, 12 N.E.3d at 658-60. The Illinois Appellate Court concluded that the trial evidence in this case was not sufficient to make that showing; so it concluded that "the trial court did not err in refusing to instruct the jury on self-defense." *Id.* at 660. This Court is bound by the Illinois Appellate Court's determination on that state law issue when deciding whether Maclin's attorney was ineffective for failing to challenge the trial court's refusal to give the self-defense instruction. *See Navarro*, 69 F. Supp. 3d at 828; *see also Bates*, 934 F.2d at 102 ("State law means what state courts say it means ... A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254."). Because the Illinois Appellate Court determined that an argument based on the trial court's rejection of this instruction would have been unavailing under state law, Maclin cannot show that his attorney was

deficient. *Navarro*, 69 F. Supp. 3d at 828; *Stone*, 86 F.3d at 717 ("Failure to raise a losing argument … does not constitute ineffective assistance of counsel.").

In addition, it is worth noting that when assessing counsel's performance, the Court must "evaluate [an attorney's] performance as a whole rather than focus on a single failing or oversight." *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010); *Sussman v. Jenkins*, 636 F.3d 329, 351 (7th Cir. 2011); *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) ("It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks."); *Navarro*, 69 F. Supp. 3d at 828. As discussed above, appellate counsel is not required to raise every non-frivolous claim on direct appeal. *Smith*, 528 U.S. at 288; *Mason*, 97 F.3d at 893. Rather, counsel may choose from among the non-frivolous claims in an effort to maximize success on appeal. *Smith*, 528 U.S. at 288.

Here, Maclin's attorney chose to pursue two other claims: (1) that the State failed to prove that Maclin was guilty of felony murder beyond a reasonable doubt because it failed to establish that he committed the underlying felony of armed robbery; and (2) that the trial court erred in refusing to admit evidence of McGhee's violent history given the defense's theory at trial that McGhee was the initial aggressor, that no armed robbery occurred, and that Maclin used the toolbox strictly for defensive purposes. Pet'r's Direct Appeal Br. at 20-33. In the first claim, Maclin's attorney argued that the State had not shown that Maclin took the toolbox through

"force or threat of force," as required under Illinois law. *Id.* at 22 (citing *People v. Gaines*, 430 N.E.2d 1043, 1058 (Ill. 1981)). Given the rather unusual facts surrounding Maclin's taking of McGhee's toolbox, and in particular, Brown's testimony that Maclin picked up the toolbox and then put it down after McGhee told him that he needed that, this was a solid argument to make. If successful, it could have resulted in a reversal of Maclin's conviction. *Id.* at 20-21 (citing to *People v. Ortiz*, 752 N.E.2d 410, 429 (Ill. 2001)). In the second claim, Maclin's attorney argued that Maclin should have been allowed to present evidence of McGhee's violent history because there was conflicting testimony as to who was the initial aggressor: Brown testified it was Maclin, while Maclin testified it was McGhee. *Id.* at 32-33. Maclin's attorney argued that the Illinois Supreme Court's decision in *People v. Lynch*, 470 N.E.2d 1018 (Ill. 1984), supported the proposition that "[w]here the theory of self-defense is raised, evidence of the victim's aggressive or violent character is relevant to support the defendant's version of the facts where there are conflicting accounts of what happened" *Id.* at 27. Maclin's attorney argued that the evidence of McGhee's violent history would have supported the defense's theory that McGhee was the initial aggressor and that Maclin used the toolbox for protection. *Id.* at 26. If successful, this claim too could have resulted in a reversal of Maclin's conviction and the granting of a new trial. *Id.* at 33 (requesting conviction reversal and remand for new trial). Given the conflicting testimony presented in Maclin's case, this argument was also a reasonable one to make. Maclin's attorney's decision to pursue these two claims—both of which had a chance of success on appeal

(although neither of which turned out successful)—rather than Maclin's self-defense argument was not "so far off the wall … [as to] qualify as deficient," *United States v. Lathrop*, 634 F.3d 931, 938 (7th Cir. 2011), especially given the fact that felony murder defendants are generally not entitled to a self-defense instruction. Accordingly, the Illinois Appellate Court's decision that Maclin's attorney was not ineffective for failing to challenge the trial court's refusal to instruct the jury on self-defense was reasonable.[7]

### C. Arguments Made During State Court Post-Conviction Proceedings

Finally, the Court also considers the arguments Maclin raised in conjunction with these two jury instruction issues during his post-conviction Petition for Leave to Appeal to the Illinois Supreme Court. Pet'r's Post-Conviction PLA. Maclin was represented by counsel at that time. Because he is currently proceeding *pro se*, the Court addresses these lawyer-written arguments in addition to the arguments Maclin raised in his federal habeas petition. *See* R. 21, 3/07/16 Minute Entry.

For the most part, Maclin's attorney relied on the same arguments Maclin presented in his habeas petition, which the Court has already addressed above. But Maclin's attorney did raise a few additional arguments. First, in responding to the Illinois Appellate Court's decision on Maclin's necessity defense argument, Maclin's attorney asserted that it was at least arguable that Maclin's hitting of McGhee did not contribute to McGhee's later aggression. Pet'r's Post-Conviction PLA at 19.

---

[7]Because the Court concludes that it was reasonable for the Illinois Appellate Court to determine that Maclin's attorney was not deficient for failing to pursue this self-defense argument, the Court need not address the appellate court's harmless error discussion. *Strickland*, 466 U.S. at 697 ("there is no reason for a court … to address both components of the inquiry if the defendant makes an insufficient showing on one").

Maclin's attorney argued that because several minutes must have passed between when Maclin hit McGhee and when Maclin picked up the toolbox (at least based on Maclin's testimony), it could be argued that Maclin's physical contact did not exacerbate the situation. *Id.* Maclin's attorney pointed to Maclin's statement that he went back to the white van and smoked more cocaine before McGhee approached Maclin in the white van and Maclin grabbed the toolbox. *Id.* But this argument does not save Maclin's necessity claim. Even taking this argument into account, the amount of time that supposedly elapsed between Maclin's hitting McGhee and Maclin's grabbing of the toolbox is just one factor that must be considered in a necessity defense analysis. The analysis would also have to take into account the other trial evidence, including Brown's testimony that Maclin was the initial aggressor, and Maclin's testimony that he was the first one to initiate contact. On balance, it is far from clear whether Maclin would have been entitled to the defense even if the elapsed time were taken into account, so the Illinois Appellate Court decision cannot be called unreasonable. And the Court must still consider Maclin's attorney's performance as a whole. *Ebert*, 610 F.3d at 411. His attorney's decision to pursue two other viable claims, rather than this necessity claim, was not unreasonable on this record. *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.").

Next, in responding to the Illinois Appellate Court's decision on Maclin's self-defense claim, Maclin's post-conviction attorney raised three additional arguments:

(1) that the appellate court "improperly reviewed only the State's evidence and not the defense's evidence of self-defense," (2) that it erred in its harmless error analysis because "an erroneous refusal to instruct on self-defense is not subject to harmless-error," and (3) that it failed to analyze the claim under the correct standard, which is "whether a post-conviction petition lacks an arguable basis in law or fact." Pet'r's Post-Conviction PLA at 2-3. These arguments again fall short. Maclin's first and third argument rest on Maclin's contention that his own testimony was sufficient to satisfy Illinois' "some evidence" standard, or at least sufficient to create an arguable basis that Maclin was entitled to the self-defense instruction. *Id.* at 15. But the problem for Maclin here is that success on either of these arguments would require the Court to conclude that the Illinois Appellate Court misapplied Illinois law. As discussed above, it is "not the province of a federal habeas court to reexamine state-court determinations on state law issues." *Estelle*, 502 U.S. at 67-68.

Maclin's second argument relates to the Illinois Appellate Court's harmless error analysis. But as noted above, the Court does not need to address that analysis. In order for Maclin to succeed on an ineffectiveness claim, Maclin must satisfy both *Strickland* prongs: performance and prejudice. *Strickland*, 466 U.S. at 697; *United States v. Jackson*, 103 F.3d 561, 575 (7th Cir. 1996) ("defendant has the burden of satisfying both prongs of the *Strickland* test"). Maclin's inability to show that the appellate court acted unreasonably in its determination that Maclin's attorney was not deficient for failing to challenge the lack of a self-defense instruction is fatal to Maclin's self-defense argument. The Court need not perform a prejudice analysis.

*Strickland*, 466 U.S. at 697 ("there is no reason for a court … to address both components of the inquiry if the defendant makes an insufficient showing on one"); *Walker*, 421 F.3d at 558 ("failure to establish either prong is fatal to an ineffective[ness] … claim").

### IV. Certificate of Appealability

As a final matter, pursuant to Rule 11 of the Rules Governing Section 2254 Cases, this Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *See also* 28 U.S.C. § 2253(c)(1)(A). To obtain a certificate of appealability, "the applicant [must] ma[ke] a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To do this, the petitioner must show that "reasonable jurists could debate whether … the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted). For the reasons discussed above, Maclin has not made a substantial showing of the denial of a constitutional right. Reasonable jurists also would not debate whether the issues described in Maclin's habeas petition should have been resolved differently, nor would they conclude that Maclin deserves encouragement to proceed further. *Id.*; *Rutledge v. United States*, 230 F.3d 1041, 1047 (7th Cir. 2000). The Illinois Appellate Court's decision on Maclin's ineffective assistance of counsel claim was well within the deference owed to state courts under AEDPA. The Court therefore declines to issue a certificate of appealability.

## V. Conclusion

For the reasons discussed above, Maclin's habeas petition [R. 1] is denied, and the Court declines to issue a certificate of appealability.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: August 23, 2016